## COLE v. COLE. (No. 7837.)

Court of Civil Appeals of Texas. San Antonio. Nov. 18, 1927.

Divorce ⟳130—Evidence held insufficient to warrant divorce for cruelty or outrages, rendering living together insupportable (Rev. St. 1925, art. 4629, § 1).

In action for divorce by husband under Rev. St. 1925, art. 4629, § 1, providing that excesses, cruel treatment, or outrages rendering living together insupportable, are grounds for divorce, evidence *held* insufficient to warrant decree of divorce.

Appeal from District Court, Cameron County; A. W. Cunningham, Judge.

Action by L. Y. Cole against Ada Simons Cole for divorce, with cross-action by defendant for divorce and a property settlement. Plaintiff had judgment, and defendant appeals. Affirmed in part, and in part reversed and rendered.

Myrick & Coursey, of Harlingen, for appellant.

Chas. R. Mayfield and Grover Reid, both of Harlingen, for appellee.

SMITH, J. L. Y. Cole and wife, Ada Simons Cole, were married on August 12, 1923. After living together for nearly three years, the husband left the wife, and afterwards brought this action for divorce. The wife contested the suit, and in turn urged a cross-action, in which she sought a divorce and a property settlement, as well as attorney's

(299 S.W.)

fees. A jury trial resulted in a verdict and judgment in favor of the husband against the wife, who has appealed.

At the time of their marriage appellee and appellant were, respectively, 69 and 52 years of age. Appellant owned a furnished residence in Harlingen, where appellee had recently purchased, entirely on credit, and was operating, a grocery business. Appellant set about at once to help her husband in his affairs. She contributed the use of her own home, in which they resided until appellee left her. She at once loaned appellee $842—all the money she then had—for his use in the grocery business, and later on loaned him $755 more. Subsequently appellee repaid these loans. She spent her days as a regular "hand" at the store, helping him run the grocery business and was concededly of great value in building up that business. Moreover, she did her own housework, including the cooking and washing, except on unusual occasions when they had the latter done by hired help. Their daily life was simple and happy. Every morning, while the husband bathed, shaved, and dressed, she prepared a hot breakfast for him. After breakfast, she washed the dishes, set the home in order, and by 8 or 8:30 was at the store, where she worked through the remainder of the day. At noon, while her husband partook of a hot lunch at a near-by eating house, she remained on duty at the store, getting a cold lunch out of stock. When evening came, and the day's work at the store was over, they closed the store and walked home, where she prepared a hot evening meal for him. He liked hot meals, particularly hot biscuits, and she saw to it that he always had them. After the evening meal, she cleaned up the kitchen and washed the dishes, which he sometimes dried for her. Then for a while they sat about the house in pleasant companionship. In due course they joined in evening worship at the family altar they had erected, and then retired for the night. This was the simple and wholesome routine of their daily lives, as related by him and confirmed by her. On Sundays they worshipped together at his church. He was a very religious man, and she herself had been a member of the church ever since she reached the age of 16. So they lived quite happily together for more than two years.

Appellant was an Ohio woman, while appellee was a southern man. Appellant had an unsettled interest in an estate in Ohio. Two years or more after the marriage it became necessary for her to go to that state in connection with her property affairs there. She remained there for several months, during which they corresponded satisfactorily to each other, and then returned home. Then appeared the first cloud upon their marital horizon, in the form of an unexpressed indifference which appellee observed in appellant's attitude towards him. Their relations were not thereby seriously affected, however; the routine of their lives seems not to have been materially disturbed.

Shortly afterwards appellee sold the grocery business, and joined appellant in a visit to her married daughter in Ohio. They went up with the purpose of making a several weeks' visit, but matters did not go to suit appellee, who insisted upon returning home at once, and they did return shortly afterwards. Small quarrels ensued, which appellee took seriously, and so he left appellant, subsequently filing this suit for divorce.

It is difficult to point out and seize upon the causes relied upon by appellee as grounds for his complaint. He alleged no specific grounds, or, rather, he set out no specific facts upon which he based his very general charge of excesses, cruel treatment, and outrages which he considered as rendering insupportable their further living together. In neither his pleadings nor his evidence did he seek to base his complaint upon any ground except that in section 1 of article 4629 R. S. 1925, which provides that a divorce may be granted "where either party is guilty of excesses, cruel treatment or outrages toward the other, if such ill treatment is of such a nature as to render their living together insupportable."

But, giving full force and intendment to appellee's testimony, and disregarding all evidence in conflict therewith, his claims of objectionable conduct upon the part of appellant amount to no more than these incidents:

First. While upon their visit to appellant's daughter in Ohio, appellee appeared not to partake very heartily of the food supplied in the daughter's home, although admitting it was bountiful and satisfactory to the daughter and her family, as well as his wife. It is inferable from the record that his objection rested largely upon the absence of hot biscuits from the meals, although the evidence tends strongly to show that appellant, knowing appellee's penchant for these concededly delightful adjuncts to a well-rounded meal, went into the kitchen, and herself cooked hot biscuits for him on numerous occasions. But appellee testified that at the dining table on the second day of the visit in the daughter's household the daughter said to his wife, in his presence, "Ma, what shall I cook for Dad? He doesn't seem to eat what we have," to which appellant replied, "Just cook whatever you want to, and, if he don't eat it, let him do without." Appellee "let that go," but later in the day told appellant he wanted to go home; that he "was not used to that kind of living." Next day, again at the dining table, appellant told her daughter that appellee wanted to go home, but that she was not ready to go. Then, according to appellee, "the daughter said, 'I would not go until I got ready. It don't make any difference what he says.' I got up and went to the door, and

said, 'Bessie, don't come between me and your mother, please. You know how it is. I want to go home, and you know how you would feel if you wanted to go home,' and she said, 'I will say what I God damn please to my mother, and.it is none of your business, by. God!' Mrs. Cole was there at that time and present at that time when her daughter said that to her. Those words were said to me. When I said that to her, that is the reply she made to me. Mrs. Cole did not make any reply. I went back ·in the room, went back some bit in there, kind of in the back room. I and Mrs. Cole returned home after that." This entire incident, or at least appellee's description of the language and interpretation of it, were flatly contradicted ·by the testimony of appellant and her daughter.

Second. While upon this visit in Ohio appellee and appellant went with the daughter and her husband to a service held by some sort of religious cult—"spiritualists," according to appellee—at which certain dark and mysterious seances occurred. Arriving at the service, a man unknown to· appellee called to appellant to "come over and take your usual place," from which appellee inferred that appellant had previously attended such services, which were held by one "Chief Ramount," whom appellee took to be a mulatto negro, while appellant and her daughter testified that this person was a former Indian chief, and well known as a "Christian gentleman, a Mason, an Elk, and a Knight of Pythias," of high character and reputation in Ohio and adjoining states. While at this service, another man approached appellant, and asked her when she was going back to Texas, and, when appellant answered, "Tomorrow," this man exclaimed, "The hell you say!" These incidents disturbed and unsettled appellee, . who thereafter brooded over them.

Third. In their leavetakings before returning home from Ohio, appellant and appellee called to say goodbye to a young couple with whom they had lived several weeks, and between whom and appellee and his wife a warm attachment seems to have sprung up. In the final adieus, out on the front steps,· and in the presence of all of them, the.young husband, in his thirties, in response to a jocular dare from the young wife, kissed appellant, 20 years his senior, upon the cheek. Appellee, present and acquiescing, if not affirmatively participating in the levity of the incident, brooded over it as an unseemly indiscretion of his wife, and made of it a serious ground for divorce.

Fourth. On the way home from Ohio, or upon arrival at home, appellee discovered in appellant's luggage a number of towels imprinted with the names of the Pullman Company and of a well-known Eastern hotel. Appellee inferred from her possession of these articles that appellant had dishonestly ac-

quired them, although appellant and her daughter explained the incident in a manner which, if true, relieved appellant of suspicion.

Fifth. After their return home, the· pair seem to have had more or less rancorous differences, the blame for which is equally distributable between them, giving full effect to appellee's testimony and disregarding that of appellant. Appellee complained to appellant of the language the daughter used towards him, and otherwise, during the Ohio visit. Appellant denied and resented the accusation that her daughter used profanity, but appellee reiterated the charge until the mother finally asserted that, if he said that her daughter "cussed," he was a "liar."

Sixth. Some time after their return home the couple went over to Mission to spend Sunday with relatives of appellant's former husband, including a niece who was visiting there from Beaumont. They enjoyed the day, notwithstanding appellee's regret that it kept him from the usual Sunday church services. The following Sunday, these relatives, acting through the young man of the family, asked appellee and appellant to go with them in their car to Point Isabel in a final courtesy to the visiting niece. Appellee declined the invitation, but appellant went along, spending the day with the other family. Appellee complains of this defection upon the part of his wife upon the ground, first, that she should have gone to church instead, and, secondly, and of much more serious portent to appellee, because it was indiscreet in his wife, aged 54, to go away for the day with a young man, who was in the early twenties, notwithstanding they were accompanied in the car by the young man's father, mother, sister, and young lady cousin, the honoree of the day's excursion.

These six incidents, interspersed .with occasional small bickerings, induced at least as much by appellee as by appellant, together with a growing indifference upon appellant's part, constitute appellee's case. He expressly disclaimed any want of confidence in the virtue, chastity, or integrity of appellant, in all of which qualities she was upheld by the uncontradicted testimony of her neighbors, who had known her intimately for years. When viewed in the light of the record, and of the uncontroverted testimony which relieves those incidents of evil or harmful purpose or effect, the case appears too frivolous and flimsy to warrant a Texas court in severing a relation ordained by the laws of God and sanctioned and solemnized in this case by the laws of man.

We conclude that the judgment should be reversed in so far as decree of divorce was granted to appellee, and in so far as the property rights of the parties were adjudicated, and the court costs apportioned equally between the parties, and that judgment should be here rendered that appellee take nothing by reason of his suit against appellant; that

in all other respects the judgment should be affirmed, at the cost of appellee in all courts. It is so ordered.

Affirmed in part, and in part reversed and rendered.